UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - x

CARLOS TAVERAS, individually and on behalf of others similarly situated,

Plaintiffs

vs.

XPO LAST MILE, INC.,

Defendant

- - - - - - - - - - - - - - - - x

XPO LAST MILE, INC.,

Third-Party Plaintiff

vs.

EXPEDITED TRANSPORT SERVICES LLC,

Third-Party Defendant

- - - - - - - - - - - - - - - - x

No. 3:15CV1550(JAM)

New Haven, Connecticut
June 20, 2016

MOTION HEARING AND RULING

B E F O R E:

THE HONORABLE JEFFREY ALKER MEYER, U.S.D.J.

Diana Huntington, RDR, CRR
Official Court Reporter

A P P E A R A N C E S:

FOR THE PLAINTIFFS AND THIRD-PARTY DEFENDANT:

HAYBER LAW FIRM LLC
221 Main Street, Suite 502
Hartford, Connecticut 06106
BY: RICHARD EUGENE HAYBER, ESQ.

LICHTEN & LISS-RIORDAN PC
729 Boylston St., Suite 2000
Boston, Massachusetts 02116
BY: HAROLD L. LICHTEN, ESQ.

FOR THE DEFENDANT AND THIRD-PARTY PLAINTIFF:

OGLETREE DEAKINS NASH SMOAK & STEWART PC
901 East Byrd Street, Suite 1300
Richmond, Virginia 23219
BY: JEFFREY H. NEWHOUSE, ESQ.

OGLETREE DEAKINS NASH SMOAK & STEWART PC
Two Stamford Plaza
281 Tresser Boulevard, Suite 602
Stamford, Connecticut 06901
BY: KELLY MARIE CARDIN, ESQ.

**3:06 P.M.**

THE COURT: We are here for argument today on principally the motion to compel arbitration in the matter of Taveras v. XPO Last Mile, Inc., 15CR1550.

Appearance of counsel?

MR. LICHTEN: For the plaintiffs, Harold Lichten.

MR. HAYBER: Richard Hayber.

THE COURT: Okay.

MR. NEWHOUSE: And for XPO Last Mile, Jeff Newhouse. And I'm with my colleague, Kelly Cardin.

THE COURT: I guess, Mr. Newhouse, the ball is back in your court.

MR. NEWHOUSE: Thank you, Your Honor.

I thought the place to start would be your order asking us for a reason for why a non-signatory could be compelled to arbitrate.

THE COURT: Do you want to come on up to the lectern, if that's okay?

MR. NEWHOUSE: Sure.

I thought we'd start with the letter and the question on whether or not Taveras could be considered a third-party beneficiary as a non-signatory to the arbitration clause.

We think that Second Circuit case law on this is

actually pretty clear. There's the *Tencara* --

THE COURT: *Tencara* case, sure.

MR. NEWHOUSE: -- case that we cite.

Our position here is that, as sole owner of ETS, he certainly had knowledge of the agreement when he signed it. Connecticut law is pretty clear that if you sign an agreement, you're expected to have read it and understood it in the formation.

And then the secondary factor on whether or not there's some sort of direct benefit that could be exploited that came out of the contracts, we think that is also pretty easily satisfied, given the thousands of dollars that was paid to Taveras' company, which in turn was then passed along to him. We certainly don't have bank statements or information like that about his company, but we do know from the settlement statements, which you've seen and were submitted under ECF 78-2, it does have the payments.

THE COURT: Well, I guess, even apart from the kind of measurable quantifiable pecuniary benefit, I suppose your argument is it's the company in which he's the owner that's getting the benefits altogether of the contract; isn't that right?

MR. NEWHOUSE: Yes, that's correct.

THE COURT: So that's essentially, at least

according to your interpretation, this is how it is that he's participating at all with respect to getting any kinds of benefits at all from the contract, from the services that he's performing; is that right?

MR. NEWHOUSE: That's right. At least as a basic matter, the way that he's allowed to -- or the way that he actually accomplished getting access to providing services is by having this company that he operated and formed and, you know, used employees and individuals. We think that's the basis on why he can be compelled to arbitrate.

And for what it's worth, within the arbitration clause which, again, he is expected to have read, you know, it says that arbitration was the sole remedy on an individual basis, whether asserted by a contract carrier, business itself, the employee, the subcontractor or the agent thereof. So we think that's probably another hook that can tie in on why there was a very reasonable basis for compelling arbitration.

THE COURT: Now, there's no dispute here, though, that -- you say he should have read it. But this was an arbitration provision drafted in the first instance by XPO, right?

MR. NEWHOUSE: That's correct.

THE COURT: And presented?

MR. NEWHOUSE: Yes, it was presented to him.

I know there was a little inconsistency within some of the briefing on whether or not it was presented to him. I think that the plaintiff has submitted declaration testimony that was presented to him and that he did have the opportunity to at least scroll through the document. At this point we certainly don't know more than that. XPO is not trying to interject more facts in this dispute that aren't there at this point.

THE COURT: Sure.

MR. NEWHOUSE: So on to the waiver argument itself. We're standing pretty firmly on our affirmative defense. I've taken a look through the Second Circuit and Connecticut case law. I'm not familiar with cases where a party asserts an affirmative defense to arbitrate and then five and a half months later in the litigation was found to have waived that right. The situations where you end up with a waiver, it's much farther along in the litigation. There will be a decision on summary judgment or perhaps depositions will have taken place. But the Second Circuit seems to be pretty firm. I don't want to call it a per-se rule, because it's not. I'm sure there are situations where a party can assert an affirmative defense of arbitration and then have it get waived. At least this early on in the litigation with what amount to

several discovery spats and a motion to dismiss --

THE COURT: I guess it does seem odd to me. Didn't you file your answer in early January?

MR. NEWHOUSE: That's correct.

THE COURT: Right. And arbitration was hardly the only affirmative defense, right?

MR. NEWHOUSE: That is also correct.

THE COURT: Wasn't it in some sort of laundry-list style, 21 different affirmative defenses? When I looked at the answer, it was really buried in there. It was number 13, right? Presumably you had 12 other better arguments. I have some difficulty with the weight that you place upon that, especially given the fact that I believe about ten or eleven days after that you joined with plaintiffs in filing a Rule 26(f) report, didn't say boo about arbitration or suggesting that, you know, the show needs to be all stopped and we shouldn't be setting a discovery order and we shouldn't be girding and preparing for full-blown litigation. That's a concern I have. It seems to me like it's an affirmative defense but it was sort of just a cut-and-paste, ended up there, no awareness or present intention at the time that it was asserted as part of the answer to actually pursue it.

MR. NEWHOUSE: As I explained I think last time that I was here, we had originally decided not to pursue

under the FAA. We left open the possibility of pursuing under the Connecticut Arbitration Act. And that was the delay.

I would just ask the Court to take a look at some of the other cases where parties in the Second Circuit, like the *Merrill Lynch* case, where a party has filed a complaint and had a basic assertion as an affirmative defense, and then the court found that arbitration wasn't waived. The idea is that even if this amount of time has passed, there's such a strong presumption in favor of arbitration under both the CAA and the FAA, and Connecticut courts do look to --

THE COURT: So basically your position is there's no waiver until essentially the eve of trial.

MR. NEWHOUSE: I don't think it's quite the eve of trial, but I do think there is something more that needs to happen such as depositions or summary judgment motion. I think going through basic discovery which would be available in arbitration --

THE COURT: So basically you can kind of test out the waters, see how the litigation is going, see if the judge is kind of leaning your way or not leaning your way, run them through a few discovery disputes, maybe even have the judge come into court, say, the month before and resolve a different motion to dismiss, and you can

basically, under that interpretation, trifle pretty much with the federal court's resources in that way and then say, aha, okay, lick the finger, put it out in the wind, figure out what way the wind is blowing and say, ah, let's take the arbitration offramp out of this federal court litigation.

MR. NEWHOUSE: I wouldn't characterize it as trifling with the federal court's resources.

THE COURT: I don't think you have any personal intent to do that, but I am troubled in the case by the fact that I have been involved and have been drawn in to resolving at least one discovery dispute I think in the middle of February prior to you sending the letter in late March announcing your intent to enforce arbitration and then obviously the litigation that accompanied, your own choice to file the third-party complaint.

I'm not sure where the line gets drawn, but I'd be surprised if the policies of the Arbitration Act in favor of arbitration say that a big, smackingly large company like XPO gets to sit back on its haunches and wait around and engage in some sort of skirmishes at the initial part of litigation and only then decide whether it's going to spring the arbitration provision on the other side.

MR. NEWHOUSE: I think the test would be whether

or not there's actually been prejudice to the plaintiff. And I think the passage of time standing on its own or these minor skirmishes --

THE COURT: And I don't doubt that the case law, the *MSO* case from the Connecticut Supreme Court, the corresponding Second Circuit case law -- although this is clearly a state law issue, right?

MR. NEWHOUSE: This is going to be a state law issue, so we would look at *MSO* and to the extent any additional guidance would --

THE COURT: *MSO* itself, though, towards the end of the ruling talks about how it will look to federal precedent at least for persuasive authority. I've also considered and think about what the Second Circuit case law says. And it seems to me that they're in lockstep, they say there has to be prejudice as well.

MR. NEWHOUSE: I don't think we actually do have prejudice here on a five-and-a-half-month stretch of time. Although the issues that the Court identified, the different discovery disputes and having some involvement on a motion to dismiss, those are certainly factors that move the case away from a slam dunk, no-waiver argument discussion, I don't think they move it along far enough to get to any prejudice to the plaintiff. So for that reason, we would say there isn't waiver here.

THE COURT: Okay.

MR. NEWHOUSE: Once we get through that waiver question, we can move on to the delegation clause and whether or not the Court has the ability to answer these questions of unconscionability that have been raised by the plaintiff.

We think case law is pretty clear on this, as far as at least within the Second Circuit, Connecticut, and the Supreme Court on what it takes for a delegation clause to be sufficient. The exact language that is in this delegation clause is taken directly from the Supreme Court's case in *Rent-A-Center*. So the question really, at least as I understand the plaintiffs' argument, is one point, which is whether or not the delegation clause can be placed in the middle of an arbitration agreement or if it needs to be set out in the same way that the class waiver language is set out. I haven't seen the cases besides I think it's the *Mohamed* case with the California case law that's taking the perspective that a delegation clause within the middle of an arbitration paragraph is problematic. We cite to you a Southern District of New York case. As plaintiff correctly points out, it is dealing with Florida law. But Florida law I think is more in line with Connecticut law which favors arbitration and looks more favorably on that issue. That alone on the

delegation clause I think would get us there.

There is the second point, which is the *Contec* case. That's the Second Circuit decision on whether or not incorporating the AAA rules into the arbitration agreement standing alone is enough to delegate authority to the arbitrator. And the court held that it was. Even without this delegation language, whether or not the Court decides that *Mohamed* may be persuasive, at the end of the day *Contec* standing alone does resolve this issue. And that would kick it right over to an arbitrator.

On the unconscionability arguments, this is where we start to settle in on the *D'Antuono* case. As I'm sure you saw in our papers, we firmly believe that that case resolves this entire question if the Court does decide to wade into the dispute on unconscionability.

In terms of procedural unconscionability, that decision makes very clear that signing an agreement, they're expected to have read it. This idea of a take-it-or-leave-it unequal bargaining power, those types of arguments are not sufficient under Connecticut law to reach procedural unconscionability. We think that resolves those issues fairly quickly that there would be a valid formation here and that's enough to step forward into the questions of substantive unconscionability.

As we explained in our papers, we are certainly

willing to waive the cost-and-fee splitting, the statute of limitations, the choice of law clause in order to retain only the confidentiality provision and the class waiver. That doesn't mean, by any means, that we're saying that those provisions are problematic. We simply understand that there's case law that is split on that issue. And while we stand on our position that those are acceptable provisions and they're not unconscionable, either under the *D'Antuono* case or the other cases that we've seen within this circuit, we would be willing to waive those provisions in order to remove any concern that the plaintiff or the Court has about some sort of unconscionability.

I know that there has been some argument by the plaintiff as to whether or not the timing is acceptable. There's, again, the *Mohamed* case that says saying at this time you're willing to waive certain provisions is not appropriate. This court has held differently in *D'Antuono*. What that case said was that a waiver of certain provisions after oral argument had taken place was still timely. The court actually issued an order and said please tell me yes or no, defendant, will you waive these provisions; the defendant said, yes, we'll waive them; and then the Court issues its order. So we don't think there's a timing issue there.

And that really only leaves the confidentiality provision and the class waiver.

The confidentiality provision is a real hallmark of arbitration, something that is recognized by the Supreme Court, the Second Circuit over and over again about a key aspect to arbitration is confidentiality.

THE COURT: Sure.

MR. NEWHOUSE: We certainly want a confidentiality in a court proceeding. We understand the plaintiff's argument on informational advantage, but I don't think it has too much traction here.

THE COURT: Tell me a little bit more about the class waiver and why that's not a problem in terms of unconscionability, if indeed I resolve that issue.

MR. NEWHOUSE: Sure.

The class waiver issue, that's going to be under Connecticut law. And it's true that the Connecticut Supreme Court has not ruled one way or the other on unconscionability. That's why the point that is the Connecticut courts look to the federal courts for interpretation on the FAA, why that point is so important. As this court previously said, five years before *Concepcion* was decided and before the Supreme Court made very clear class waivers were not problematic under federal law, the Connecticut Supreme Court -- there's no

reason to think that that court would deviate from the federal courts on how to deal with class waivers. There's simply no valid basis, because the Connecticut courts are so pro arbitration that we expect them to go the same way that the federal courts have gone. The plaintiff does make the argument that there may be some wiggle room by following an overturned Second Circuit decision. With all due respect, I simply don't think the Connecticut courts would follow an overturned federal court decision when they have a Supreme Court decision to look to on the validity of class waivers.

Unless the Court has any other questions --

THE COURT: I don't think so, thank you.

MR. NEWHOUSE: Thank you.

THE COURT: Mr. Lichten.

MR. LICHTEN: Thank you, Your Honor.

I'd like to try to take that a little bit in reverse order.

I find it remarkable, indeed extraordinary, that after full briefing on this issue of unconscionability and the provisions that we pointed out to you that make this arbitration clause permeated with unconscionability, the type of unconscionability that Justice Rogers in the *Booker* case when he was sitting on the Court of Appeals said would prevent the Court from hacking away but instead

refused to enforce it, that they come before you without any notice to me and say we're actually not seeking enforcement of those provisions, so that cures the problem. As both the Ninth Circuit pointed out in *O'Melveny & Myers* and as Judge Chen pointed out in the *Uber* case and as the Tenth Circuit pointed out in *Nesbitt*, that's not the time that you can agree to just magically say, okay, well, we really screwed up this arbitration clause with all those unconscionability provisions but we're magically saying you don't have to worry about that. Because here's the problem, the individual who would come to arbitration needs to make some prediction when they're deciding whether to go to arbitration as to whether it's worthwhile, whether they have any chance of succeeding. And if the definition of "unconscionability" is no rational person who is not drunk would agree to such provision, in this case you have six significantly unconscionable provisions, three of which would preclude any chance of success. They just willy-nilly came in and said we're going to waive the choice of law provision. This choice of law provision is not the difference between winning a lot and winning a little. The choice of law of Georgia means that there was no chance of bringing the case because what they've never admitted, but what's clear, is that Georgia doesn't have a wage statute. This

case is about, because these individuals were employees, money was illegally deducted from their checks. But if Georgia doesn't have a wage statute that prohibits these deductions, which it doesn't, which we've pointed out, it would be unable for any of these individuals, such as my client, to vindicate their statutory rights.

In addition, Georgia has presumption in favor of independent contractor status if someone has executed such an agreement. And Connecticut has the opposite conclusion, it's presumption that someone is an employee unless the employer can establish the ABC test. Similar to this, the Ninth Circuit in *Ruiz v. Affinity Logistics* actually found that the choice of law provision of Georgia could not apply. Now, I know they're waiving it now. But the point is that, as the Tenth Circuit says and as Judge Chen says in *Uber*, if you're an individual looking at whether to bring this case or not and you see a provision that says (1) I have to split these costly arbitration fees, (2) I can't win under any circumstances because Georgia law applies, (3) even if I win, I can't get back my attorneys' fees, the statute of limitations is shortened, no one in their right mind would sign such an agreement.

THE COURT: Well, that might be the case, although your client did. Right? So it seems to me that

if we look at the here and now, the here and now would be that you're in a position where your rights that you're complaining about, the unconscionable provisions, wouldn't end up having an application to you, or many of them at least.

MR. LICHTEN: Your Honor, in every case where the question is unconscionability someone has signed an arbitration agreement and courts find it unconscionable not because the person refused to sign it but because they did sign it.

But speaking to that point, one of the reasons that might explain what my client did is because it's in his declaration that he was never actually shown the arbitration agreement. He says in his declaration, and the standard at this point is summary judgment, he said that his boss came and scrolled it down to the signature page and he saw the signature page and he signed it. He says he never got the agreement until two months after he signed it. And that's not really contested. And that's in the record.

So in any event, even if he had seen the agreement, the provisions I've just talked about are still unconscionable, and there is no possible way he would have understood the question of Georgia law applying, et cetera, although I don't think that's the standard. I

think the standard is whether the contract is written in such a way that no reasonable person would possibly sign an agreement of that nature. And that clearly is the situation here.

And my point is that you can't just come into court months later without even telling the other side that you're doing this and say, we're willing to waive all that now. Because how is the next -- especially if you go to arbitration, the proceedings are required to be confidential, which also disadvantages any plaintiff because every time they can get the benefit of six or seven arbitrations, know what allows them to win the case, what doesn't, and no person bringing a case to arbitration because of the confidentiality provision would never know what happened, what evidence worked, what the evidence was, and they will be accumulating all this arbitration-type evidence.

Anyway, so --

THE COURT: Is the argument here on the Georgia law point that it's unconscionable for the drafter of a contract to include a choice of law provision to any one of the 50 states that has law that the drafter may perceive as being favorable that's not otherwise invalid law, hasn't been struck down by the Supreme Court of Georgia?

MR. LICHTEN: That's not what makes it unconscionable. In fairness, they are a Georgia company. What makes it unconscionable is that if this were in court, you would apply the restatement. So the restatement says you apply the choice of law that's in a contract or an agreement except that where to do so would violate the public policy of the state having the most contacts, then you must apply the law of that state.

Now, there's no question, it's absolutely clear that Connecticut law would apply here, they've essentially conceded as much.

THE COURT: Absent a choice of law provision.

MR. LICHTEN: Absent choice of law.

But here's the thing. An arbitrator has no right to apply choice of law. Arbitrators, as we pointed out in our brief, are creatures of contract. And therefore an arbitrator can only apply the law that's given to them. This agreement specifically says you, arbitrator, must apply this contract as written and you may not add or subtract from it. So that's what makes it unconscionable.

Mr. Taveras would have no chance of bringing successfully a claim based upon this arbitration provision that requires Georgia law to apply even though it's clearly unconscionable as for him because such a choice of

law provision is unconscionable because it would prevent him -- and this is in the Supreme Court -- from vindicating his statutory rights, which is cause for a court to invalidate the agreement.

And again, my argument would be, and I think it's supported by good case law, that the time to look at this is when the individual is making the decision whether to bring the claim or not, not what happens six months later in a court of law when all of a sudden they say, well, we're not getting very far with this, we're going to drop all those provisions. Because, again, how would the individual possibly know that this is going to happen in six months? And the vindication of statutory rights is something that should be determined at the time the person is making that decision, at the time he was fired, not now.

Now, with respect to the waiver issue, Your Honor, it is true that this is on the line. I agree with you that there are cases that go both ways on this. I don't want to make short shrift of that. But there is enough here in this case, you have a sophisticated firm, they've conceded to you that they've made a strategic decision. It's not like they said, oh, my God, there was an arbitration provision, we just found it in the drawer of the vice-president, which has happened. They're saying

we knew there was an arbitration provision, we were wondering whether we should bring it given that the FAA doesn't apply to transportation workers, it would come under Connecticut law, so we're going to make a strategy decision to wait and see what happens and then we'll decide whether to do it. That's not what the standard is for delay. Delay would be that for reasons which are valid and sufficient reasons they've decided not to bring it and they just discovered it or something happened. But here they offer no excuse at all except they were making a strategy judgment decision. And this case was filed in October. We gave extensions. And they brought this motion, you know, in April, five or six months later after a lot of work was done in this case and the counterclaim --

THE COURT: So if I agree with you and I have concerns that there was a strategic tactical manipulation here that distinguishes this case from others, I think I'm still required to find that there's prejudice. Can you describe what prejudice?

MR. LICHTEN: Well, it would be hard -- it's hard for me to say, to be honest, that there is specific prejudice that I can point to except the passage of time of six months and our having to litigate fairly vigorously in this Court various motions. And the delay --

THE COURT: So, in a sense, it's not like a case where -- and you have these sometimes where cases go to trial or you get pretrial rulings that are effectively undone, so there's what the Court of Appeals calls substantive prejudice. But you do have a procedural prejudice here in the sense, I think, that you've been litigating, you've been forced to litigate, you've got a motion or a third-party complaint filed effectively against you right now, your client, ETS, that incurred and put really an ethical obligation on you to raise a concern about the indemnification provision and moved to dismiss. You engaged in discovery, I take it.

MR. LICHTEN: Yes, we have.

THE COURT: Discovery of the type that might not have been required.

MR. LICHTEN: And we've had conferences with the Court regarding a number of discovery disputes.

Yes, the case was filed in October of 2015. It's now late June of 2016. If you were to compel us to arbitration, we have to start all over again. It's not that we just go to an arbitrator. We have to go to the American Arbitration Association, you have to go through the list procedure, then somebody has to be appointed. You further are then going to have the unconscionability problems of they're going to have to agree, I guess

they're going to say we're going to pay the whole cost of the arbitration. That has to be established. So now we're talking really about a year before this thing gets off the ground. Then we start the discovery again, the arbitrator sets forth a discovery schedule. So there is a delay of a year.

Now, our client, as you can see from his affidavit -- and there was a mathematics error in the calculation in his affidavit -- he makes about $5,000 a month delivering for LaserShip. He runs around in his van delivering medical products, with his gas and his expenses, he spends about $3,000 a month. So he has effectively an income of $25,000 a year. For him to have to wait so long is prejudicial. He's got a wife and family, as he says. I can't sit here and say that there's prejudice beyond that, that there's some decision that you made, et cetera, that would come into play. I just can't say that.

THE COURT: In terms of the kind of substantive prejudice of concrete benefits that you garnered in the litigation that would be undone; is that what you mean?

MR. LICHTEN: That's what I mean, yes.

That's basically what I wanted to say.

I do want to reiterate the main point. I do want to say as follows. This is a question of Connecticut

law. This is a question now of whether or not someone can put into an arbitration agreement six provisions that are unconscionable, put them all together, make the whole arbitration provision unconscionable, and then come to court six months later and say, surprise, we're not seeking to enforce that.

If the Court -- and I agree there aren't a lot of cases that address this. There are some in the Ninth Circuit and the Tenth Circuit, but there's no case, I think, in the Second Circuit or Connecticut that has addressed this particular issue. You could certify this question to the Connecticut Supreme Court. I frankly think it would be a public service not only in this case if you were leaning that way, but to others to do this, because this is a very important issue, this issue of people putting in all these unconscionable provisions in arbitration agreements and then coming to court and say we'll waive them. Especially here where *D'Antuono* was decided under federal law. This is state law, the Connecticut Supreme Court has a right to weigh in. And the important policy provision in this, which is what Justice Roberts alludes to in his decision, is that I don't believe this Court or any court wants to give an incentive to companies to put in every conceivable bad unconscionable provision they can into an arbitration

agreement thereby encouraging that with companies knowing that they come to court and say, just kidding, the court severs them all, and forces the person to arbitration. There's got to be a point at which companies have to be told they can't do that. I think that's what Justice Roberts was referring to in the *Booker* case, at some point it becomes hacking away, not severing. And I think the question would be justified to be certified.

THE COURT: Okay.

MR. LICHTEN: If you have any questions, Your Honor --

THE COURT: I take it that would result in substantial prejudice for the rights of your client --

MR. LICHTEN: Well, no.

THE COURT: -- in terms of the timing concerns that you spoke about.

MR. LICHTEN: Well, no, for the following reason. If what you're going to do is relegate him to arbitration, I don't think that would be a substantial prejudice to him. I think he is more likely to get the determination he wants in court.

THE COURT: Thank you.

Mr. Newhouse, anything to follow up on?

MR. NEWHOUSE: If I could, Your Honor, just one point on the procedural prejudice under waiver.

My reading of at least the Connecticut case law and the Second Circuit case law that the Court is looking to is that the passage of time or litigation costs standing alone are not enough to equal prejudice sufficient to constitute a waiver. Some of the cases that we talk about here are the *Rush* decision that I would like to point the Court to. I think even the *Doctor's Assocs.* decision or the *New River Elec.* decision, all of these cases seem to make clear that "delay alone is insufficient to establish waiver." The passage of time just isn't enough. Litigations are inherently expensive in federal court. So the expense of legal fees isn't enough to constitute prejudice. That would be the only point that I would like to make.

THE COURT: So your position is you could essentially run the plaintiffs around the maypole and have them defend and litigate for a year or so, and if the Court hasn't actually acted on things but they've put together sheaves and sheaves of briefs, that wouldn't be prejudice?

MR. NEWHOUSE: I think under the Second Circuit's decision in *Rush* and the *Discov. Property* decision, that it's true that that would not constitute prejudice, that delay alone is insufficient to establish prejudice. I think that is the state of the law now as it

stands.

THE COURT: Okay.

MR. NEWHOUSE: That's all I have, Your Honor.

THE COURT: Do you have anything else?

MR. LICHTEN: No, Your Honor.

THE COURT: Okay. I appreciate the parties' very able arguments. I've given them thought coming into today's argument, and I'm going to rule at this time on the motion to keep, I hope, things proceeding. Having considered the parties' briefs and arguments, I am going to summarize the ruling as follows.

This proceeding involves defendant XPO's motion to compel individual arbitration and to stay litigation. XPO, of course, seeks to enforce an arbitration clause against the plaintiff Carlos Taveras and the third-party defendant Expedited Transport Services, LLC (or ETS). This arbitration clause of course is contained in the Delivery Service Agreement (the DSA) which was signed by XPO and signed by plaintiff Taveras in his capacity as owner of ETS.

I think at the outset that all the parties do agree that it is Connecticut law that governs disposition of the motion, in particular the Connecticut Arbitration Act and Connecticut contract law, although Connecticut law at some points looks to circuit law and Second Circuit law

as persuasive authority. After my review of the parties' arguments, my principal concern -- I think you could probably tell from some of the questioning I had -- is with respect to the waiver issue. And on balance, I'm persuaded the combination of the actions taken by XPO in this case were sufficient to amount to an intentional waiver and that there's sufficient prejudice here to meet the standards for a waiver. So I'm going to conclude that XPO has waived its right to seek arbitration.

Now, in Connecticut, of course, waiver is a very fact-bound inquiry. It is the intentional relinquishment or abandonment of a known right or privilege. Though waiver need not be express, acts or conduct may imply that a party has waived a privilege. The party asserting a defense of waiver must show that it was prejudiced. And that's the case *MSO, LLC v. DeSimone*, 313 Conn. 54, Connecticut Supreme Court decision from 2014. Now, Connecticut case law demonstrates that certain types of conduct may imply waiver and support a finding of prejudice to the party asserting waiver, such as "lengthy pretrial discovery or fact-finding, engaging in extensive pleading or motion practice, initiating continuances, and moving for arbitration on the eve of trial"; or "causing an opposing party to expend undue time and expense in litigation prior to seeking arbitration"; or "attempting

to utilize the advantages derived from litigation in a later arbitration, including discovery that is unavailable in arbitration." And that's all in the *MSO* case at page 67 and Footnote 14.

Here, XPO knew that it had the right or, really, the obligation to arbitrate under the DSA because it was XPO that drafted this very agreement in the first place and that imposed it as a condition for plaintiff Taveras to do business with XPO. The arbitration provision of the agreement, Paragraph 21.1, provides in strikingly mandatory terms that any dispute arising out of or relating to the agreement "shall" be settled by arbitration and that arbitration "is the only remedy for any Claim related to or arising out of this Agreement." The idea that XPO was at liberty somehow to see which way the wind was blowing, take its time deciding whether it was going to avail itself of the arbitration provision under this agreement runs contrary to the very mandatory language that XPO itself drafted here.

Despite this knowledge of its duty to arbitrate, XPO opted instead to file a third-party court complaint against ETS in this litigation, though the litigation having been initiated by Taveras against XPO in the first instance. More troubling still, the third-party complaint filed by XPO asserted a right of indemnification under a

separate paragraph of the agreement; thus XPO, in my view, quite brazenly tried to use a part of the DSA (that is, the indemnification provision) to secure an advantage in this litigation, all the while knowing, in light of the separate arbitration provision that appears on the very next page of the agreement, that it had no business pursuing any kind of a claim of relief in a court in the first place.

So I can scarcely imagine a clearer conduct amounting to waiver, in that waiver is a knowing and intentional relinquishment of a known right. Still, my ruling is not based solely on the fact that XPO quite inexplicably and, in my view, illegitimately filed a third-party court complaint against ETS in contravention of the very agreement that it drafted to arbitrate. I will accept arguendo that, standing alone, the simple filing of a court complaint by a party to an agreement with a mandatory arbitration clause does not suffice by itself to constitute a waiver of the agreement to arbitrate in the absence of other circumstances establishing waiver. And Judge Cabranes talks about this in his decision for the Second Circuit in *Louisiana Stadium v. Merrill Lynch*, 626 F.3d. 156, 160 (2d Cir. 2010).

But, on the other hand, that does not mean, in

my view, that such conduct of filing a court complaint in the teeth of a mandatory arbitration agreement is not relevant and is not evidence among other factors of whether a party should be deemed to have waived its rights and evidence of prejudice. Here, it is apparent to me that XPO filed the third-party suit not as a result of inadvertence or ignorance but as a tactic that in turn caused prejudice to Taveras and ETS alike. It tried, in effect, to expand the litigation in this case, as the parties and the Court alike (through litigation and oral argument in this case) expended time to resolve plaintiff's motion to dismiss XPO's third-party complaint, a complaint that XPO should never have filed in the first place in light of the arbitration clause.

Likewise, in my view, XPO's delay in asserting any rights that it had led to XPO garnering the benefits of discovery from Taveras. Indeed, XPO issued plaintiff 23 interrogatories and 34 requests for production of documents, as to which the plaintiff complied on April 1, 2016. What is more, XPO's failure to assert its right to arbitrate also led to further expense to all concerned with respect to the litigation of one of the discovery disputes that we had here and that required me to resolve that dispute on the basis of the parties' letter briefs in the middle of February 2016. Frankly, all this would have

been unnecessary had XPO timely asserted its arbitration rights and not sought to impose costs on plaintiff and exploit this litigation to its advantage before electing to assert its arbitration rights.

The Second Circuit has made clear that, and I quote: "Waiver will be inferred when a party engages in protracted litigation that results in prejudice to the opposing party. Sufficient prejudice" -- and I'm still quoting -- "to infer waiver has been found when a party seeking to compel arbitration engages in discovery procedures not available in arbitration, makes motions going to the merits of an adversary's claims, or delays invoking arbitration rights while the adversary incurs unnecessarily delay or expense. The waiver determination necessarily depends upon the facts of a particular case and is not susceptible to bright line rules." That's from the *Cotton v. Slone* case, 4 F.3d. 176, 179 (2d Cir. 1993).

Additional reasons, in my view, support a finding of waiver and prejudice, all of which are evident from the somewhat lengthy docket before me. Taveras' complaint here was filed in October, late October of 2015, and XPO's counsel filed multiple notices of appearance in early December 2015. XPO then sought a continuance to answer the complaint. Under the *MSO* decision from the Connecticut Supreme Court, that's a factor implying

waiver. The parties then held a Rule 26(f) conference and filed a Rule 26(f) case planning/discovery report, which conspicuously failed to mention arbitration other than by acknowledging the existence of affirmative defenses, it turned out there were 21 of them. In reliance on that report, I issued a comprehensive case scheduling order on January 22, 2016. And as I've noted, both parties engaged in substantial discovery, including that involved me in the resolution of a discovery dispute on February 18, 2016. XPO thereafter litigated two motions to dismiss its third-party complaint which, under Connecticut law, in my view, constitutes substantial motion practice that implies a waiver. XPO did not advise, in formal terms, of its intention to seek arbitration until its letter to plaintiffs' counsel in late March 2016.

Now, XPO, Mr. Newhouse today, has pointed to the fact that it filed its answer in January 2016 that included arbitration as an affirmative defense. But as I discussed during argument today, arbitration was listed as 13th of 21 laundry-list-style, kitchen sink boilerplate affirmative defenses. And this did not immunize, in my view, XPO from clearly otherwise repudiating that right or its obligation by other actions in the prosecution and defense of this lawsuit, such as, as I've noted at oral argument, just days later after filing this answer that it

says put everybody on notice that it was going to seek arbitration, joining in the Rule 26(f) report and joining in a request for a comprehensive discovery order and discovery plan and motions plan in this case.

Now, I don't doubt, and I concede it's true, that the case for waiver would be stronger still if XPO had waited even longer until the eve of trial, as has occurred in other cases where waiver has been found, such as in the *Louisiana v. Merrill Lynch* case, or in Connecticut, under Connecticut law, the *Waterbury Teachers Assn. v. City of Waterbury* case from 1973 involved those kinds of facts. But, in my view, the fact that even more egregious cases of waiver can be found does not negate a conclusion that XPO's conduct here did not amount to a waiver where it was evidently motivated for tactical gain, and I'll emphasize and underscore that I think that that very deliberate tactical gain motive here is a factor that's present here to a degree not present in other cases of the type that I've seen, and that it did result in consequent prejudice to plaintiff. We've had a back-and-forth today about what that prejudice is. Again, it's not prejudice in the sense that the case was on the brink of trial or it was undoing particular rulings that I had made to wipe the slate clean for those, but it was, in my view, a sufficient prejudice on the balance of all

factors to amount to a waiver which itself is a very fact-intensive inquiry. And I can't help but conclude, as I've said today during the course of oral arguments, that I'm left with a view that XPO has essentially trifled with the federal court's time by means of the steps that it took to participate in and prolong this litigation despite knowledge of its duty to compel arbitration at a far earlier time. I'm concerned about the moral hazard of allowing a party, a large, well-advised company like XPO, to engage in the kind of tactic here that results in cost, somewhat considerable cost to plaintiff as well as to the Court, as it would do in this case.

So, in short, the motion to compel individual arbitration and to stay the litigation, Doc. Number 55, is denied because I conclude that XPO has waived its right to seek enforcement of the arbitration provision within the standards of the law set forth under the law of Connecticut.

Likewise, the motion for protective order to stay discovery pending resolution of the arbitration motion, Doc. Number 58, will be denied as moot in light of my ruling on Document Number 55.

I appreciate the parties' -- and I didn't ask questions about this because I wanted to hear some more about what the parties had to say about these other issues

that they briefed, including supplemental letter briefs that I appreciate the parties having submitted, but I'm not going to address in this ruling the parties' arguments about whether the arbitration provision is unconscionable or whether it extends to Taveras as a non-party in his individual capacity.

So that's the Court's ruling at this time.

Is there anything else for the Court to take up at this time?

MR. LICHTEN: No, Your Honor.

MR. NEWHOUSE: No, Your Honor.

THE COURT: I expect that the parties will, absent any other intervening events, will -- we've got discovery, obviously a Rule 26(f) plan in place.

In the event that the parties see fit at any point if you'd like to meet with a magistrate judge, I'm happy to make that referral if you think there's some sort of a resolution that's possible short of further litigation in the case.

Okay. We'll stand in recess. Thank you.

(Proceedings adjourned at 3:57 p.m.)

C E R T I F I C A T E

RE: CARLOS TAVERAS, ET AL. v. XPO LAST MILE, INC.
No. 3:15CV1550(JAM)

I, Diana Huntington, RDR, CRR, Official Court Reporter for the United States District Court for the District of Connecticut, do hereby certify that the foregoing pages 1 through 37 are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.

/s/

DIANA HUNTINGTON, RDR, CRR
Official Court Reporter
United States District Court
141 Church Street, Room 147
New Haven, Connecticut 06510
(860) 463-3180